UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ARTHUR J. STEBBINS,                                        **REPORT**
                                                           **and**
                              Plaintiff,          **RECOMMENDATION**

            v.                                    **06-CV-0610-A (F)**

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                              Defendant.[1]


_____

APPEARANCES:        LAW OFFICES OF JEFFREY E. MARION, Esq.
                    Attorneys for Plaintiff
                    Jeffrey E. Marion, of Counsel
                    17 Beresford Court
                    Williamsville, New York 14221

                    TERRANCE P. FLYNN
                    United States Attorney
                    Attorney for Defendant
                    JANE B. WOLFE
                    Assistant United States Attorney, of Counsel
                    Federal Centre
                    138 Delaware Avenue
                    Buffalo, New York 14202

## JURISDICTION

   This case was referred to the undersigned on December 17, 2006, by the

Honorable Richard J. Arcara for Report and Recommendation on all dispositive motions.

_____

[1] On February 12, 2007, Michael J. Astrue became Commissioner of Social Security and,
pursuant to Fed.R.Civ.P. 25 (d)(1), is substituted for his predecessor, JoAnne B. Barnhart, as the
defendant in this action.  No further action is required to continue this suit.  42 U.S.C. §
405(g)("Any action instituted in accordance with this subsection shall survive notwithstanding any
change in the person occupying the office of Commissioner of Social Security or any vacancy in
such office").

The matter is presently before the court on Plaintiff's motion for judgment on the
pleadings (Doc. No. 9), filed on March 21, 2007, and on Defendant's cross motion for
judgment on the pleadings (Doc. No. 12), filed on May 11, 2007.

## BACKGROUND

Plaintiff Arthur J. Stebbins ("Plaintiff") seeks judicial review of the final
administrative decision of the Commissioner of Social Security, pursuant to 42 U.S.C. §
405(g), in denying Plaintiff Supplemental Security Income Benefits ("SSI").  The
Commissioner denied the claim because he found that Plaintiff "has the residual
functional capacity to perform a significant range of light work."  (R. 16).  The
Commissioner determined that the objective medical evidence reveals that Plaintiff does
have problems with his back, asthma, and impairments that are severe within the
meaning of the Regulations but not severe enough to meet or medically equal one of
the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (R. 14).
Furthermore, the Commissioner determined that although such impairments are
capable of causing significant limitations, the medical evidence does not support the
severity of limitations the Plaintiff describes.  (R. 16).  According to the Commissioner's
opinion, the evidence, including a lack of evidence supporting Plaintiff's claims,
evidence of Plaintiff's daily activities, and a determination that Plaintiff is not fully
credible, established that Plaintiff's condition is relatively stable, he is doing generally
well, and is capable of doing more than Plaintiff alleges.  (R. 16).

**PROCEDURAL HISTORY**

Plaintiff initially applied for SSI benefits on November 13, 2001.  (R. 36-38).  The

application was denied on May 21, 2002.  (R. 20-24).  On June 19, 2002, Plaintiff

requested a hearing by an Administrative Law Judge ("ALJ").  (R. 25).  A hearing was

held before ALJ J. Robert Brown on June 11, 2003 in Buffalo, New York.  (R. 13-19).  At

the hearing, Plaintiff, who was represented by his attorney, Jeffrey E. Marion, appeared

and testified on his own behalf.  (R. 238-67).  On July 14, 2003, the ALJ issued a

decision finding that the Plaintiff was not disabled.  (R. 10-19).  Plaintiff requested

review of the ALJ's decision on September 16, 2003, and the ALJ's decision became

the final decision of the Commissioner when the Appeals Council denied Plaintiff's

request for review on July 13, 2006.[2]  (R. 4-6).  This action followed on September 8,

2006.

On March 21, 2007, the Plaintiff filed a motion for judgment on the pleadings,

pursuant to Fed. R. Civ. P. 12(c) ("Rule 12(c)") (Doc. No. 9), supported by the attached

Plaintiff's Memorandum in Support of Motion for Judgment on the Pleadings ("Plaintiff's

Memorandum").  On May 11, 2007, the Defendant filed a cross motion for judgment on

the pleadings, pursuant to Rule 12(c), (Doc. No. 12) ("Defendant's Motion) and a

Memorandum of Law in Support of the Commissioner's Motion for Judgment on the

Pleadings (Doc. No. 3) ("Defendant's Memorandum").

Based on the following, Plaintiff's motion for judgment on the pleadings should be

---

[2] The record is devoid of any evidence explaining why almost three years elapsed
between the date Plaintiff requested a review of the hearing decision on September 16, 2003, and
the date the Appeals Council actually rendered such decision on July 13, 2006.

GRANTED in part and DENIED in part; Defendant's crossmotion for judgment on the

pleadings should be DENIED.  The matter should be REMANDED to the ALJ for further

proceedings, including a new hearing and development of the record, consistent with

the findings herein; however, because the record fails to demonstrate bias on the part of

the ALJ, Plaintiff's request that the matter be assigned to a different ALJ upon remand

should be DENIED.

## **FACTS**

The Plaintiff, Arthur J. Stebbins, born on November 6, 1954, (R. 17), has

completed high school and taken some college courses. (R. 242).  From 1983 through

1998, Plaintiff worked a variety of jobs, including: real estate agent, car salesman,

insurance salesman, carpenter helper, and was self-employed in home improvement.

(R. 14).  Plaintiff alleges he became disabled on January 1, 1998 due to back problems,

memory loss, anxiety, and gastroesophageal reflux disease.  (R. 14).

On January 11, 1999, Plaintiff was involved in a motor vehicle accident ("the

accident"), when the vehicle Plaintiff was driving was involved in a head-on collision with

another vehicle.  (R. 81).  Plaintiff did not immediately seek medical attention, but upon

awakening the next morning with severe neck and back pain, sought treatment at

Lakeshore Hospital's emergency room, where X-rays were taken and Plaintiff was

discharged with instructions to follow up with his family physician for pain and possible

physical therapy.  (R. 81).

Between April 28, 2000 and June 29, 2000, Plaintiff was treated by Dr. Cameron

B. Huckell, M.D. ("Dr. Huckell"), for unresolved low back pain related to the accident.

(R. 78-82).  A physical examination on April 28, 2000, showed an almost full range of motion in the low back, with pain at the "extremes," Plaintiff's strength was 5/5 in the lower extremities, there were no paraspinal muscle spasms, straight leg raising test was negative bilaterally and Plaintiff was neurologically intact.  (R. 82).  Dr. Huckell referred to an MRI, no otherwise found in the record, as revealing  an occult spina bifida[3] at the S1 vertebral segment, but no other abnormalities.  (R. 82).  Because Plaintiff continued to complain of chronic low back pain almost 18 months after the accident, Dr. Huckell ordered another MRI to rule out any disc or ligament strain.  (R. 82).  The MRI of Plaintiff's lumbar spine was taken May 24, 2000, and showed moderate disc degeneration with mild bulging of the anulus fibrosis at L5-S1, and minimal L4-L5 disc degeneration.  (R. 80).

On June 29, 2000, Dr. Huckell noted that Plaintiff's gait was normal and he was neurologically intact.  (R. 78).  Dr. Huckell diagnosed degenerative disc disease with mild bulging at the L5-S1 disc level, and recommended Plaintiff avoid heavy manual jobs and look for lighter, more sedentary work.  (R. 78).

On January 29, 2001, Plaintiff began receiving monthly treatment from psychiatrist George Parlato, M.D. ("Dr. Parlato") (R. 111-26).[4]  According to treatment notes from a February 26, 2001 psychotherapeutic session with Dr. Parlato, Plaintiff

---

[3] "Occult spina bifida" is a mild form of spina bifida occurring in 5% to 10% of the population, the vast majority of which experience no problems related to the condition, which often goes undetected until an X-ray is taken of the spine for an unrelated problem.  "Information on Spina Bifida, *available at*: http://www.fortunecity.com/millenium/plumpton/268/sb.htm.

[4]The earliest treatment notes in the record from Dr. Parlato indicate that Plaintiff was examined by  Dr.Parlato on January 29, 2001 (R. 124), although it is not clear from the record when Plaintiff first sought treatment from Dr. Parlato.

was unable to tolerate Valerian (used to treat sleep disorders), but believed Plaintiff's recent illness, including a stomach flu with nausea and constipation may have contributed to his intolerance.  (R. 124).  Plaintiff reported missing his mother, who was deceased, and that his father had become quite dependent on him and demanding.  (R. 124).  Plaintiff also expressed negative feelings toward his adult daughter who had recently moved in with Plaintiff's ex-wife.  *Id*.

At Plaintiff's March 26, 2001 psychotherapeutic session, Dr. Parlato reported Plaintiff's "major problem is forgetfulness for short term events."  (R. 122).  For example, Plaintiff, in the midst of conversation, Plaintiff would forget what he was talking about. *Id*.  Plaintiff was also "quite irritable," confrontational and "seems to be quite provocative." *Id*.  According to Dr. Parlato, Plaintiff did not speak of his father or his daughter, but spoke of "his love of firearms and his shooting at a car a year ago, at which point he [Plaintiff] gave up his weapons and lost his pistol permit, but hopes to get it back." *Id*.  Although Plaintiff reported sleeping better, Valerian did not help, so it was discontinued and Dr. Parlato prescribed Serzone (antidepressant).  *Id*.  Dr. Parlato also noted Plaintiff had panic attacks, rage attacks, manic attacks, depression, and trouble sleeping.  (R. 123).  Dr. Parlato assessed that Plaintiff's home and social relationships were "fair," work and school relationship were not applicable, Plaintiff had homicidal fantasies, but no plans or behavior, and his recent memory was poor.  *Id*.
On April 23, 2001, Plaintiff reported to Dr. Parlato experiencing several interpersonal relationship problems, including losing his girlfriend, being sued by a friend, and feeling hurt that his adult daughter did not call Plaintiff at Easter.  (R. 120).  Plaintiff did, however, report getting along better with his father. *Id*.  Plaintiff's memory remained

poor and he continued experiencing depression and sleep problems. *Id*.  Plaintiff recounted how his mother took care of him when Plaintiff was quite ill with asthma as a youngster, and Dr. Parlato opined that Plaintiff still missed his mother, who passed away four years earlier (R. 103), "very much."  (R. 120).   Dr. Parlato increased Plaintiff's Serzone dosage, and added Ambien for sleep.  (R. 120).  Dr. Parlato noted that since his last visit, Plaintiff had experienced anxiety, depression, and trouble sleeping, and that Plaintiff's relationships were fair with regard to home and poor with regard to social.  (R. 121).  Dr. Parlato assessed Plaintiff's mental status as angry and anxious, with a depressed mood, poor recent memory and fair response to treatment. (R. 121-22).

Upon seeing Dr. Parlato on May 21, 2001, Plaintiff reported "extremely poor sleep" the previous night, but had otherwise been sleeping well.  (R. 119).  When Dr. Parlato mentioned that Plaintiff reported experiencing loss and anger whenever Plaintiff gambled at a casino, Plaintiff reported that his friend lost $ 700, but declined to mention how much he had lost. *Id*.  Plaintiff spoke of his feelings of loss of his daughter's love, who did not call him. *Id*.  Plaintiff also reported getting "very angry at women especially as they seem to delay him," as in driving on the highway.  *Id*.  When Plaintiff mentioned he had not been taking his Serzone, Dr. Parlato reminded Plaintiff of the importance of taking Serzone as prescribed "for the sake of steady state." *Id*.

At his June 18, 2001 appointment, Plaintiff reported to Dr. Parlato that his girlfriend wanted to get back together with him.  (R. 119).  Plaintiff arrived late to the appointment, blaming the traffic and slow drivers, and continued to have only fair sleep, but Plaintiff's mood was otherwise brighter and rapport was more positive. *Id*.

When Plaintiff saw Dr. Parlato on July 16, 2001, Plaintiff was "doing better" and his mood was brighter.  (R. 118).  Plaintiff stated his daughter called him and promised to bring him a Father's Day card.  *Id*.  Plaintiff's relationship with his girlfriend was improved and he felt better about himself, although sleep continued to be a problem.  *Id*.

At his August 23, 2001 appointment with Dr. Parlato, Plaintiff reported enjoying a recent trip with a male friend to Connecticut to gamble, and mentioned he hoped to write a book about slot machines and Plaintiff perceived himself as "quite proficient and successful in this area."  (R. 117).  Plaintiff's short-term memory continued to be problematic, and he was "not doing very well with Serzone," and wished to take Remeron (antidepressant used to treat major depressive disorders).  At that time, Plaintiff had regular contact with his daughter, but was concerned about his elderly father who was undergoing chemotherapy for terminal lung cancer and expressed concern about the failure of Plaintiff's brother to contact their father.  *Id*.  Plaintiff also told Dr. Parlato that Plaintiff was ending his relationship with his girlfriend because Plaintiff believed his girlfriend was only dating Plaintiff for his money.  *Id*.  Dr. Parlato discontinued Serzone, and prescribed Remeron.  *Id*.

Plaintiff next saw Dr. Parlato on September 27, 2001, in a "special session" scheduled because Plaintiff was "VERY upset" about his father's death two days earlier, and "extremely agitated."  (R. 116).  Plaintiff expressed to Dr. Parlato "much anger against his brother who could not be bothered to help him out and who did not visit his father until it was too late." *Id*.  Plaintiff stated many people owed his father money and Plaintiff was expected to collect the unpaid debts. *Id*.  Plaintiff's dismay over his father's death was further complicated by unresolved anger Plaintiff expressed regarding the

8

September 11, 2001 terrorism act that occurred only two weeks earlier, and spoke of anger toward "towel heads" he had recently encountered at the casino in Canada, whom Plaintiff was convinced were involved in acts of terrorism, which prompted Plaintiff to contact the Federal Bureau of Investigation. *Id*. Dr. Parlato discontinued Remeron, and prescribed Valium for insomnia, and Desyrel for depression. *Id*.

Upon returning the following week, to Dr. Parlato on October 4, 2001, Plaintiff was "making magnificent progress" and reported recently discovering some previously unknown information about Plaintiff's ethnicity, including that he was part Native American, part English and part Polish, as well as information about his father's siblings. (R. 115). Plaintiff expressed "much anger" toward the undertaker who made the arrangements for Plaintiff's father's funeral, believing the undertaker had overcharged him. *Id*. Plaintiff also reported he still did not have a strong relationship with his daughter, and was "very bitter" toward his ex-wife because his ex-wife dated African-Americans, and thereby gave permission for the daughter to do likewise. *Id*. Dr. Parlato reported that Plaintiff

> is less hostile with me [Dr. Parlato] but his anger at other people remains almost monumental but he presents no great danger to himself or others as long as he follows my orders of continuing Valium [   ] and Desyrel [ ] and to avoid abusing alcohol.

*Id*.

Dr. Parlato continued Valium and Desyrel. *Id*.

At his next appointment on October 22, 2001, Plaintiff reported having two separate confrontations with police the previous two weekends, including one for speeding and one for driving while under the influence of alcohol ("DUI"). (R. 114).

9

Following the DUI arrest, Plaintiff spent the night in jail in Angola and released the next day after contacting an attorney. *Id*. Plaintiff expressed his anger toward the police in both words and actions, explaining that a "'sheriff . . . Italian . . . little guy" had stopped him for driving 10 miles over the speed limit, and Plaintiff had to appear in court. *Id*. Plaintiff wanted to discuss with Dr. Parlato a recent dream involving pots and pans, but because Plaintiff had arrived late to the session, time did not permit. *Id*. According to Dr. Parlato, Plaintiff's anxiety level was "high throughout the entire session and did not abate but slightly at the end." *Id*. Further complicating Plaintiff's situation was the fact that his social services counselor was leaving the area in December. *Id*. When Dr. Parlato told Plaintiff that Plaintiff's depression was complicated by alcohol abuse, Plaintiff disagreed. *Id*. Dr. Parlato renewed Plaintiff's prescriptions for Valium and Desyrel, and advised against using alcohol. *Id*.

At his November 12, 2001, appointment with Dr. Parlato, Plaintiff informed that two weeks earlier he had been arrested in Fredonia, New York for shoplifting, although Plaintiff did not remember actually walking out of the store without paying for the alleged shoplifted item, and Plaintiff had enough money with him to pay for the item. (R. 113). Plaintiff spoke of money his father had allegedly buried. *Id*. Plaintiff told Dr. Parlato about a dream Plaintiff had in which he was with his father in his father's bedroom, and his father had a full head of gray hair, as he did prior to receiving chemotherapy, and also had two eyes, in contrast to the fact that his father had lost an eye in an accident years earlier. *Id*. According to Plaintiff, pots and pans "'flew across the room,'" although this was not part of the dream; rather, Plaintiff believed the flight of the pots and pans signified that Plaintiff's father's spirit was "unhappy and not at rest." *Id*. Plaintiff also

believed that his father's remains had never been cremated, and Plaintiff continued "to harbor angry thoughts against the undertaker, who did not offer the wake services as promised and as contracted." *Id*. Plaintiff expressed his belief that he would not receive a fair trial in Angola on the pending charges for driving while his ability was impaired ("DWAI").[5] *Id*. Plaintiff was experiencing new sleeping problems, including that he fell asleep around midnight, only to awaken three hours at which time he was unable to fall back asleep. *Id*. Plaintiff also claimed that Desyrel gave him "a hangover," but that Valium helped with Plaintiff's anxiety. *Id*. Dr. Parlato discontinued Desyrel in favor of Somnos, renewed Plaintiff's prescription for Valium, advised against alcohol consumption, and discussed with Plaintiff possibly prescribing Lithium. *Id*.

On November 13, 2001, Plaintiff filed his application for disability benefits. (R. 36-38). In supporting documentation completed in connection with the application, Plaintiff stated that he usually wakes up in late afternoon, and had difficulty sleeping at night. (R. 66). Plaintiff shops, manages his finances, reads, speaks to friends on the phone, visits friends, and plays with his dog. (R. 66). Plaintiff also reported taking care of his personal needs and his dog, watching television, preparing meals, performing chores, doing laundry, mowing his lawn, walking, driving, using public transportation, riding a bicycle, and going out by himself. (R. 66). Plaintiff also described his memory problem as causing him to forget if he had food cooking on the stove or inside the microwave, and would often take out frozen food to thaw, then forget about the food and

---

[5] Although Dr. Parlato, on October 22, 2001, reported Plaintiff had been arrested for "driving while under the influence of alcohol" ("DUI") (R. 114), and on November 12, 2001, referred to the charges pending against Plaintiff as for "driving while ability impaired," (R. 113), the court notes that both DUI and DWAI refer to the same offense, specifically, a violation of New York Vehicle and Traffic Law § 1992(1) (McKinney 1996).

discover it three days later.  (R. 67).

On December 6, 2001, Plaintiff sought treatment from neurologist Peterkin Lee-Kwen, M.D. ("Dr. Lee-Kwen") for memory loss Plaintiff attributed to the 1999 automobile accident.  (R. 98-100).  Dr. Lee-Kwen noted that Plaintiff was neurologically intact, his muscle tone was normal, and he had no atrophy.  (R. 99).  Dr. Lee-Kwen opined that Plaintiff did not have primary memory disorder but, rather, opined Plaintiff's "memory disorder was mainly secondary to external stressors and superimposed psychiatric condition."  (R. 99).  Dr. Lee-Kwen also questioned whether Plaintiff had a bipolar disorder based on Plaintiff's pressured speech and incoherent thought processing, and noted that Plaintiff would follow up with his psychiatrist "because of the current features, which are not well controlled at this time."  (R. 99).

At Plaintiff's next appointment with Dr. Parlato on December 10, 2001, Dr. Parlato diagnosed Plaintiff with Bipolar Disorder NOS (not otherwise specified).  (R. 112).  Plaintiff told Dr. Parlato that Plaintiff's daughter noticed his severe mood swings, multiple arrests and multiple confrontations with authority figures, chronic insomnia and irritability, and continued inability to form a close relationship with any man or woman. *Id*.  Plaintiff reportedly became angry with his attorneys, causing him to fire them and, thus, was without legal representation at his court appearances.  *Id*.  Dr. Parlato noted that Plaintiff "is expecting me to be everything and every body [*sic*] to him and thus his reality testing shows some impairment."  *Id*.  To illustrate this point, Dr. Parlato mentioned a letter composed by Plaintiff in a manner as to appear to have been written by Dr. Parlato, and asked Dr. Parlato to present the letter as if it were Dr. Parlato's

recommendation to Judge Barone[6] in support of reinstating Plaintiff's driving privileges. *Id*. Dr. Parlato cautioned Plaintiff against driving long distances while taking Valium and Lithium and also advised Plaintiff to abstain from alcohol. *Id*. Dr. Parlato also described "pressure of speech and inability to focus against the backdrop of feelings of continuing depreyation [*sic*] at the hands of others coexisting with feelings of outrage and anger against the world that chronically denies him [Plaintiff] what he feels is his due." *Id*. Dr. Parlato prescribed Lithium for bipolar disorder, and renewed prescriptions for Valium and Somnos, and advised against using alcohol. *Id*.

On January 17, 2002, Plaintiff was referred by the Office of Disability Determination to Thomas Dickinson, Ph.D. ("Dr. Dickinson"). (R. 102-105). Plaintiff complained of back problems, difficulties with memory, anxiety, sleep disturbance, rage outbursts and esophageal reflux disease, and also reported problems standing or lifting, and difficulties being around people. (R. 102-105). Dr. Dickinson noted that Plaintiff's speech was clear, logical, coherent, and concrete. (R. 102). Plaintiff indicated that he watched television, read, went for short walks, performed chores, cooked, did laundry, shopped, and took public transportation. (R. 103). Dr. Dickinson reported that Plaintiff was cooperative and his orientation was fair, but that Plaintiff appeared to have troubles with anxiety, suspiciousness, or unusual behaviors. (R. 103). Dr. Dickinson assessed Plaintiff's insight and judgment were fair, and that Plaintiff's social and personal skills were mildly to moderately limited. (R. 103). On the Wechsler Adult Intelligence Scale-

---

[6] Although not specifically stated in the record, Dr. Parlato's reference to "Judge Barone" appears to be to Evans Town Justice Anthony J. Barone, Jr., presumably in connection with Plaintiff's arrest for driving under the influence in Angola, New York, which is a village located within the Town of Evans.

Third Edition, Plaintiff scored a 91 in Verbal IQ, an 83 in Performance IQ, and had a Full

Scale IQ of 87.  (R. 103).  Dr. Dickinson assessed Plaintiff's overall functioning as in the

low-average range, for which Plaintiff's prognosis was fair with continued medication

and counseling.  (R. 105).  Dr. Dickinson reported that Plaintiff would have difficulties

with employment requiring time pressure, work decisions, quick memory assignments,

handling complex directions or flexible and distracting situations.  (R. 105).

On January 17, 2002, Plaintiff was also consultatively examined by M. Jaffri,

M.D. ("Dr. Jaffri") (R. 106-10).  Plaintiff reported that he had been diagnosed with

gastroesophageal reflux disease ("GERD") in October 2001, and was taking Prevacid

for the condition.  (R. 106).  Plaintiff indicated that he has had asthma all of his life, but

denied any recent asthma attacks, emergency room visits, hospitalizations, or any use

of medication for his asthma.  (R. 106).  Plaintiff reported experiencing memory loss and

anxiety since a motor vehicle accident in April 1999.  (R. 106).  Physical examination

revealed Plaintiff's heart with a regular rate and rhythm, no murmur, lungs were clear to

auscultation bilaterally and no rales or wheezing were noted, and no evidence of JVD

(jugular vein distention) or lung rales noted.  (R. 107).  The same examination revealed

that Plaintiff's sitting was unremarkable, he walked slowly with some lagging of the left

leg, (R. 107), he could squat with back discomfort, and an x-ray of the lumbrosacral

spine was normal.  (R. 107).  Plaintiff's hand grip was 5/5 in both hands.  (R. 107).  Dr.

Jaffri opined that Plaintiff was limited in lifting and carrying heavy weights, had mild

limitations to prolonged standing, walking, and sitting, mild limitations with pushing and

pulling, and had limitations working in a stressful environment because of his history of

anxiety and emotional problems.  (R. 108).

14

At Plaintiff's January 29, 2002, appointment with Dr. Parlato, Plaintiff stated he had been out of Valium for ten days, although Plaintiff exhibited no withdrawal symptoms, such as shaking, convulsions or increased irritability.  (R. 111).  Dr. Parlato surmised that Plaintiff's Valium prescription had run out because Plaintiff took as many as six tablets a day, and a storm in late December 2001 had prevented Plaintiff from keeping an earlier appointment.  *Id*.  Plaintiff reported having obtained legal representation who was to assist Plaintiff in getting back his driver's license.  *Id*.  Because Plaintiff did not like the letter Dr. Parlato composed for Plaintiff to present in support of restoring Plaintiff's driving privileges, so Plaintiff destroyed the letter.  *Id*.  Plaintiff mentioned that during his consultative examination at Sister's Hospital, he told the examining physician that the physician was an Afghan, despite the physician's stating he was from Pakistan.  *Id*.  Plaintiff stated he was attempting to have the shoplifting charges pending against him in Fredonia settled, and wanted to commence legal action against the authorities whom Plaintiff maintains mishandled the matter. *Id*. Dr. Parlato assessed Plaintiff as "quite litigious," although Lithium was helping and no severe mood swings were reported.  *Id*.  Plaintiff's prescriptions for Lithium, Valium and Somnos were renewed.  *Id*.

On February 26, 2002, George Burnett, M.D. ("Dr. Burnett"), a physician with the New York State Department of Social Services Office of Disability Determinations, considered Plaintiff's anxiety, insomnia, and outbursts of rage, and opined that Plaintiff had mild restrictions of activities of daily living, moderate difficulties in maintaining concentration, persistence, or pace and no episodes of decompensation.  (R. 193).  It was Dr. Burnett's opinion that Plaintiff was not significantly limited in his ability to

15

remember locations and work-like procedures, understand, remember, and carry out short and simple instructions, understand and remember detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and make simple work-related decisions.  (R. 193).

Dr. Burnett also opined that Plaintiff was not significantly limited in his ability to ask simple questions or request assistance, maintain socially appropriate behavior, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (R. 197).  Furthermore, Dr. Burnett was of the opinion that Plaintiff was moderately limited in his ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  (R. 197)

On March 19, 2002, J. Serghany, M.D., ("Dr. Serghany"), examined Plaintiff in connection with Plaintiff's asthma, conducting a Pulmonary Function Test.  (R. 199).  Dr. Serghany reported that Plaintiff's forced vital capacity score before bronchodilator was 1.92 and after bronchodilator was 2.52.  (R. 199).  Plaintiff's one-second forced expiratory volume score before bronchodilator was 1.38 and after was 1.84.  (R. 199). Plaintiff's test results indicate chronic obstructive pulmonary disease (COPD).  (R. 225).

On April 29, 2002, Robert Keenan, M.D., ("Dr. Keenan"), examined Plaintiff for the New York State Office of Temporary and Disability Assistance.  (R. 226)  Plaintiff denied any emergency room visits or hospitalizations relating to his asthma.  (R. 227). Plaintiff claimed that he washed dishes, shoveled snow, mowed his lawn, did laundry, went grocery-shopping, went up and down stairs, took care of his personal needs, drove, opened jars, and performed chores.  (R. 228).  Upon examination, Dr. Keenan reported decreased air entry throughout all lung fields but no crackles or wheezes.  (R. 229).  Muscle strength was 5/5 throughout with power diminished slightly in the left lower extremity.  (R. 229).  Plaintiff was able to complete all fine motor movements bilaterally with his hands.  (R. 230).  Dr. Keenan noted that Plaintiff's gait was normal, and that Plaintiff had no muscle atrophy.  (R. 230).

At the administrative hearing on June 11, 2003, Plaintiff, represented by Charles Scibetta, Esq. ("Scibetta"), appeared and testified on his own behalf.  (R. 238-67).  In response to the ALJ's questions, Plaintiff testified that he prepares his own meals, grocery shops, and watches television.  (R. 252).

During the hearing, the ALJ's only mention of Dr. Parlato was to question why Plaintiff was seeing Dr. Parlato.  (R. 250).  Plaintiff responded that he sought treatment from Dr. Parlato for severe depression and memory problems after another psychiatrist, Dr. Reubenstein, failed to help him with his memory and depression issues.  (R. 250-51).  The ALJ did not question Plaintiff, at the hearing, about his bipolar disorder as diagnosed by Dr. Parlato.

During Mr. Scibetta's examination, Plaintiff testified to having radiating pain in his spine, stating he could move a chair and lift a gallon of milk with one hand by supporting

the bottom of the gallon jug with his other hand, and had pain with prolonged standing and sitting which sometimes required Plaintiff to lay down for an hour or two.  (R. 253-55).  Despite questioning Plaintiff about his pain (R. 253-56), poor memory (R. 256-58), difficulty sleeping (R. 258-59), and recent legal troubles, including shoplifting, speeding, and driving while ability impaired (R. 259-61), Scibetta did not question Plaintiff about his bipolar disorder.

At the conclusion of Plaintiff's testimony, the ALJ called Vocational Expert Tim Janikowski, Ph.D. ("Janikowski"), to whom the ALJ posed several hypotheticals regarding the impact of Plaintiff's non-exertional limitations on his ability to work.  (R. 262-266).  The initial hypothetical posed to Janikowski included a hypothetical claimant of the same age and with the same education and work employment history as Plaintiff, having some physical restrictions including asthma, some emotional problems of organic mental disorders, affective disorders and a personality disorder, all which mildly restrict activities of daily living and result in mild to moderate difficulties maintaining social functioning, concentration, persistence and pace.  (R. 263).  Janikowski opined that such an individual would have a difficult time performing Plaintiff's past work in sales which is are "people oriented" jobs.  (R. 263).  The ALJ modified the hypothetical to include moderate restrictions posed by personality disorders, but physically able to perform light work.  (R. 263).  Janikowski assessed such a person would be restricted to unskilled, things-oriented work, such as a hand packager, assembler, custodian or office cleaner, of which there were, in total, 5,975 jobs in the local labor market.  (R. 264).  In further response to the ALJ's questions, Janikowski testified that if physical limitations restricted such a person to only sedentary work, there were in the local labor

market 1,076 seated assembly jobs and quality control or production inspector jobs

Plaintiff could perform.  (R. 264).  When memory and distractibility problems were

added to the hypothetical, Janikowski opined that if such problems were more than mild,

it would render the person unemployable.  (R. 264-65).  Finally, Janikowski opined that

any problem requiring a person to lay down for an hour or two more would generally not

be employable if the condition occurred more than one day per month.  (R. 265-66).

Janikowski was not asked to opine on the effect of a bipolar disorder.


## DISCUSSION

**I.     Disability Determination Under the Social Security Act.**

An individual is entitled to disability insurance benefits under the Social Security

Act if the individual is unable

> …to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to
> result in death or which has lasted or can be expected to last for a
> continuous period of not less than 12 months…  An individual shall be
> determined to be under a disability only if his physical or mental
> impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and
> work experience, engage in any other kind of substantial gainful work
> which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & 423(d)(2)(A), and 1382c(a)(3)(A) &

1382c(a)(3)(C)(I).

Once the claimant proves that he is severely impaired and is unable to perform

any past relevant work, the burden shifts to the Commissioner to prove that there is

alternative employment in the national economy suitable to the claimant.  *Parker v.*

*Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  "In assessing the disability, the Commissioner

must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Monguer v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

### A.    Standard and Scope of Judicial Review

The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative judge's findings are supported by substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion."  *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and…educational background, age and work experience."  *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of the treating physician is supported by medically acceptable techniques and result from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight.  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d)

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence.  *Dumas v. Schweiker*, 712 F.2d at 1550; 42 U.S.C. §

405(g); 42 U.S.C. § 1383(c)(3).  "Congress has instructed…that the factual findings of the Commissioner, if supported by substantial evidence shall be conclusive." *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The federal regulations set forth a five-step analysis that the Commissioner must follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520, 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982).  The first step is to determine whether the applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the individual is engaged in such activity the inquiry ceases and the individual cannot be eligible for disability benefits.  Id.  The next step is to determine whether the applicant has a severe impairment, which significantly limits his physical or mental ability to do basic work activities, as defined in the regulations.  20 C.F.R. §§ 404.1520(c), 416.920(c).  Absent an impairment, the applicant is not eligible for disability benefits.  Id.  Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d), 416.920(d), as, in such case, there is a presumption that an applicant with such an impairment is unable to perform substantial gainful activity.  42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920.  *See also Cosme v. Bowen*, 1986 WL 12118, at *2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional

21

capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If

the applicant can still perform work he has done in the past, the applicant will be denied

disability benefits.  *Id.*  Finally, if the applicant is unable to perform any past work, the

Commissioner will consider the individual's "residual functional capacity," age, education

and past work experience in order to determine whether the applicant can perform any

alternative employment.  20 C.F.R. §§ 404.1520(f), 416.920(f).  *See also Berry v.*

*Schweiker*, 675 F.2d at 467 (where impairment(s) are not among those listed, claimant

must show that he is without "the residual functional capacity to perform [his] past

work").  If the Commissioner finds that the applicant cannot perform any other work, the

applicant is considered disabled and eligible for disability benefits.  *Id.*  The applicant

bears the burden of proof as to the first four steps, while the Commissioner bears the

burden of proof on the final step relating to other employment.  *Berry*, 675 F.2d at 467.

In reviewing the administrative findings, the court must follow this five-step analysis to

determine if there was substantial evidence on which the Commissioner based her

decision.  *Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).


**B.      Substantial Gainful Activity**

The first inquiry is to determine whether the applicant is engaged in substantial

gainful activity.  "Substantial gainful activity" is defined as "work that involves doing

significant and productive physical or mental duties and is done for pay or profit."  20

C.F.R. §§ 404.1510 and 416.910.

In the present case, the ALJ concluded that Plaintiff had not engaged in

substantial gainful activity since the alleged onset date of his disability, January 1, 1998.

(R. 14).  That finding is undisputed.


### C.    Severe Physical or Mental Impairment

The next step of the analysis is to determine whether the applicant had a severe physical or mental impairment significantly limiting his ability to do "basic work activities."  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Basic work activities" include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).  Further, a physical or mental impairment is severe if it "significantly limit[s]" the applicant's physical and mental ability to do such basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a) (bracketed text added).

In the present case, the ALJ concluded that the medical evidence established that Plaintiff suffers from back problems, asthma, and depression.  (R. 14).  The record, however, establishes that Plaintiff's treating psychiatrist, Dr. Parlato, diagnosed Plaintiff with a bipolar disorder NOS, a symptom of which was depression.  (R. 112).  This condition had been suspected by Dr. Lee-Kwen.  (R. 99). Because the ALJ failed to acknowledge Plaintiff's bipolar diagnosis by Plaintiff's treating physician, the ALJ also failed to consider the severity of such impairment in continuing on  to the next step, a finding of whether Plaintiff's condition was severe enough to be set forth in the Listing of Impairments, Appendix 1, 20 C.F.R. Pt. P, Regulation No. 4.

**D.      Listing of Impairments, Appendix 1**

The third step is to determine whether any of a claimant's impairment or

impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P

("the Listing").  If the impairment or impairments are listed in the Appendix and the

listing's durational requirements are satisfied, the impairment or impairments are

considered severe enough to prevent an individual from performing any gainful activity

and the individual is deemed disabled, regardless of the applicant's age, education or

work experience.  20 C.F.R. § 404.1525 (a) and 416.925(a); *Melville v. Apfel*, 198 F.3d

45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed

impairments, the claimant is considered disabled").

In the present case, the ALJ found that the medical evidence indicates that

Plaintiff has back problems, asthma and depression, all of which are impairments that

are severe within the meaning of the Regulations but not severe enough to meet or

medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No.

4.  (R. 14).   In making this finding, the ALJ conducted an evaluation with detailed

reference to the physical impairments that are reflected in the record, namely, Listing

§§3.03 (asthma), 1.04 (musculoskeletal impairments), and 12.04 (affective disorders).

(R. 14-16).  Upon review, the court finds that substantial evidence in the record supports

the ALJ's determination with regard to Plaintiff's asthma and musculoskeletal

impairments.  The ALJ's failure, however, to acknowledge the treatment records of

Plaintiff's treating psychiatrist, Dr. Parlato, including Plaintiff's bipolar condition,

diagnosed by treating psychiatrist Dr. Parlato, creates a significant gap in the ALJ's

analysis as to whether Plaintiff is disabled by a mental impairment or a combination of

physical and mental impairments.

Because Plaintiff does not dispute the ALJ's determination that the severity of Plaintiff's asthma and musculoskeletal impairments did not meet the criteria for disability based on the relevant listed impairments, the court does not discuss such findings. Rather, the court limits its consideration of the ALJ's determination to the severity of Plaintiff's depression and bipolar disorder.

Plaintiff contends that the ALJ erred as a matter of law by failing to consider whether Plaintiff's bipolar disorder was a severe impairment.  Plaintiff's Memorandum at 7-14.  Defendant has not responded to this argument, maintaining, instead, that the evidence in the record establishes that Plaintiff was not disabled by depression. Defendant's Memorandum at 16-18.

Initially, the court observes that at the administrative hearing, the ALJ only mentioned Dr. Parlato in questioning why Plaintiff was seeing Dr. Parlato.  (R. 250). Plaintiff responded that he sought treatment from Dr. Parlato for severe depression and memory problems after another psychiatrist, failed to help him with his memory and depression issues.  (R. 250-51).  The ALJ's decision is thus devoid of any mention of Dr. Parlato or Plaintiff's bipolar disorder, as well as Dr. Parlato's treatment notes covering the period January 2000 through January 2001.

A bipolar syndrome is one of the three syndromes on which disability may be based on an affective disorder under Listing § 12.04, the other two syndromes being depressive syndrome and manic syndrome.  *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.04A(1) (depressive syndrome), (2) (manic syndrome), and (3) (bipolar syndrome).

Disability based on depressive syndrome is

characterized by at least four of the following:
(a) Anhedonia or pervasive loss of interest in almost all activities; or
(b) Appetite disturbance with change in weight; or
(c) Sleep disturbance; or
(d) Psychomotor agitation or retardation; or
(e) Decreased energy; or
(f) Feelings of guilt or worthlessness; or
(g) Difficulty concentrating or thinking; or
(h) Thoughts of suicide; or
(i) Hallucinations, delusions or paranoid thinking.

20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.04A(1).

Disability based on manic syndrome is

characterized by at least three of the following:
(a) Hyperactivity; or
(b) Pressure of speech; or
(c) Flight of ideas; or
(d) Inflated self-esteem; or
(e) Decreased need for sleep; or
(f) Easy distractibility; or
(g) Involvement in activities that have a high probability of painful consequences which are not recognized; or
(h) Hallucinations, delusions or paranoid thinking.

20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.04A(2)

To be disabled based on the criteria for bipolar syndrome set forth in Listing § 12.04, a plaintiff need establish "a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)." 20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.04A(3). Once the criteria of § 12.04A are met, the plaintiff must also demonstrate that he has at least two of the following: (1) marked restrictions of activities of daily living; (2) marked difficulties maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.04B. Alternatively, disability based

26

on depressive, manic or bipolar syndrome may be demonstrated by

> "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than minimal limitation of the ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychological support, and one of the following:
> (1) Repeated episodes of decompensation, each of extended duration; or
> (2) A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> (3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App. 1 §12.04C.

Significantly, the ALJ's determination that although Plaintiff has exhibited some depression, the record fails to establish that the severity of Plaintiff's depressive disorder met or equaled the diagnostic symptoms listed in §12.04.  (R. 16).  This finding, however, was made without any consideration of treating psychiatrist Dr. Parlato's reports, which establish that during the 13-month period[7] in which Dr. Parlato treated Plaintiff, Plaintiff exhibited symptoms of both depressive and manic syndrome.  *See*, *e.g.*, R. 112, 113, 116, 118, 119, 121, 122, 123 (chronic insomnia); 112, 122 (severe mood swings); 112, 116, 122 (irritability); 112, 113, 114 (multiple arrests and confrontations with law enforcement and authority figures); 112 (pressure of speech) 112 (inability to focus and easy distractibility); 112, 113, 114, 115, 116, 119, 120, 121, 123, 124 (feelings of deprivation by others coexisting with outrage and anger against the world); 113, 114 (hallucination about pots and pans flying across room); 114, 116,

---

[7] The last report from Dr. Parlato is dated January 29, 2002 (R. 111), and it is not clear from the record whether Plaintiff continued to seek treatment from Dr. Parlato after that date.

117, 119, 120, 121, 123, 124 (depression); 115, 116 (paranoia); 123 (homicidal

ideation), and 117, 123 (delusions).  Moreover, Plaintiff's actual diagnosis of bipolar

disorder NOS ("not otherwise specified"), by Dr. Parlato is not covered by the criteria for

disabilty based on bipolar syndrome under 20 C.F.R., Pt. 404, Subpt. P, App. 1

§12.04A(3) which requires finding the Plaintiff meets the requirements for both

depressive and manic syndromes.[8]  Rather, the relevant criteria for Plaintiff's bipolar

disorder NOS are found under 20 C.F.R., Pt. 404, Subpt. P, App. 1 §12.04C, which the

ALJ also failed to consider.

In fact, Dr. Lee-Kwen, a neurologist from whom Plaintiff sought treatment for his

memory problems attributed to the accident, upon examining Plaintiff on December 6,

2001, "wondered" whether the Plaintiff was suffering from a bipolar disorder.  (R. 98-

100).  In particular, Dr. Lee-Kwen's assessment of Plaintiff included the following:

> The memory disorder was mainly secondary to external stressors and
> superimposed psychiatric condition.  I wonder whether he has a bipolar disorder
> because of his pressured speech and incoherent thought processing.  This was
> contributing to most of the somatic symptoms.  I am not sure that this was
> triggered by the motor vehicle accident, or is something that is possible related to
> multiple social stressors. . . . He is going to see the psychiatrist for further
> intervention because of the current stressors, which are not well controlled at this
> time.

(R. 99).

---

[8] "'Bipolar disorder is a serious medical illness marked by mood shifts and episodes of
depression and mania.  The Diagnostic and Statistical Manual of Mental Disorders lists four
separate categories of bipolar disorder: bipolar I, bipolar II, cyclothymia, and bipolar not-otherwise
specified (NOS).  Bipolar I is marked by manic episodes, followed by periods of depression that
may not be severe.  In contrast, Bipolar II is marked by major depressive episodes and hypomanic
periods, or milder episodes of mania.  Cyclothymia is defined as episodes of hypomania and
depressive periods that do not reach major depressive proportions.  Bipolar NOS means that the
bipolar state does not fit into the other categories.'"  *Temple v. Astrue*, __ F.Supp.2d __, 2008 WL
1787724, * 9 n. 2 (W.D.N.Y. Apr. 17, 2008) (quoting Penn State University, Milton S. Hershey
Medical Center College of Medicine Website, *available at*:
http://www.hmc.psu.edu/healthinfo/b/bipolar.htm (April 11, 2008)).

That Plaintiff's symptoms of his bipolar disorder, subsequently diagnosed by Dr. Parlato, were sufficiently severe as to be observed and remarked upon by Dr. Lee-Kwen, who was evaluating Plaintiff for the source of Plaintiff's claimed memory loss, is some evidence as to the severity of such symptoms.

Additionally, Dr. Dickinson's report of his January 17, 2002 "organicity evaluation" of Plaintiff's "back problem, memory difficulties, anxiety troubles, poor sleep, rage outbursts, and esophageal reflux disease," which was performed on a consultative basis in connection with Plaintiff's disability benefits application, includes findings that Plaintiff was "a cooperative and methodical man . . . with somewhat constricted thoughts and concrete vocabulary" who was easily confused.  (R. 103).  Plaintiff also presented with a "blunted affect and sense of resignation . . . . with mixed depression and cynicism," although Dr. Dickinson did not observe any anxiety or suspiciousness.  (R. 103).  Dr. Dickinson assessed Plaintiff's insight into his situation as "fair," general daily judgment as "fair," and social and personal skills were mildly to moderately limited.  (R. 104).  Dr. Dickinson diagnosed a Cognitive Disorder NOS, and Amnestic Disorder NOS, and noted that Plaintiff had previously been diagnosed with Bipolar Disorder.  (R. 104).

Although it is not within the purview of the ALJ to review symptoms and determine a diagnosis and an ALJ may not arbitrarily substitute his own judgment for competent medical opinion, *Wallace v. Secretary of HHS*, 722 F.2d 1150, 1155 (3d Cir. 1983)  ("an ALJ is not free to set his own expertise against that of physicians who present competent medical evidence"), here, the ALJ failed to obtain any psychiatric assessment of Plaintiff from Dr. Parlato.  Moreover, Dr. Parlato undeniably is Plaintiff's treating psychiatrist, and the ALJ's complete failure not only to consider Dr. Parlato's

treatment records, but also to obtain Dr. Parlato's opinion of Plaintiff's bipolar disorder on Plaintiff's ability to work violates both the treating physician rule, *see Schisler*, 3 F.3d at 567 (If the opinion of the treating physician is supported by medically acceptable techniques and result from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d), as well as the ALJ's duty to develop the record. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (holding the ALJ has an affirmative duty to develop the record).

Accordingly, Defendant's motion for judgment on the pleadings should be DENIED; Plaintiff's motion for judgment on the pleadings should be GRANTED, and the matter REMANDED for further development of the record, including obtaining Dr. Parlato's opinion as to Plaintiff's ability to work, particularly in light of Plaintiff's bipolar condition, any additional treatment records from Dr. Parlato after January 29, 2002, and a new hearing before the ALJ. Although the undersigned is recommending this matter be remanded for further proceedings, should the District Judge disagree with this recommendation, the balance of the five-step analysis is considered, in the interest of completeness.

### E.    "Residual Functional Capacity" to Perform Past Work

The fourth inquiry in this five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work. "Residual functional capacity" is defined as the capability to perform work comparable to the applicant's past substantial gainful activity. Based upon the claimant's residual functional capacity, the

ALJ must determine whether the claimant can perform any of his past relevant work.  In

the present case, the ALJ determined that Plaintiff possessed residual functional

capacity to perform a full range of light work, but that Plaintiff's past relevant work

experience included work as a real estate agent, car salesman, insurance salesman,

carpenter helper, and self-employment in home improvement.  (R. 17).  Relying upon

the testimony of the vocational expert, which was based upon the Plaintiff's testimony

and medical records, that the Plaintiff should avoid people, the ALJ found that Plaintiff

was unable to perform his past relevant work because Plaintiff's residual functional

capacity exceeded the exertional demands of his past work.  (R. 17).  This finding is

undisputed, and the ALJ's failure to consider Plaintiff's bipolar disorder does not affect

this finding.


**F.      Suitable Alternative Employment in the National Economy**

        The ALJ then proceeded to step five of the evaluation analysis.  Once the

claimant has established that he has no past relevant work experience or cannot

perform his past relevant work because of his impairments, the burden shifts to the

Social Security Administration to show that there are other jobs existing in significant

numbers in the national economy that the claimant can perform, consistent with the

Plaintiff's residual functional capacity, age, education, and work experience.  *Parker v.*

*Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  Because the ALJ did not consider Plaintiff's

bipolar disorder, that impairment was not considered with regard to this step of the

analysis.

        The claimant's age, education, and vocationally relevant past work experience, if

any, must be viewed in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations ("the Grids"), which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile.  *Decker v. Harris*, 647 F.2d 291, 296 (2d Cir. 1981).  The Grids are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any nonexertional limitations.  *Decker*, 647 F.2d at 294.  Further, where a plaintiff's nonexertional limitations further significantly limit the plaintiff's ability to work, apart for any incapacity attributed solely to exertional limitations such that the plaintiff is unable to perform the full range of employment otherwise indicated by the Grids, the ALJ should obtained testimony from a vocational expert as to the impact of the nonexertional limitations.  *Bapp*, 802 F.2d at 603.  In this case, relying upon the testimony of the vocational expert and Medical-Vocational Guidelines as a framework for his decision, the ALJ concluded that Plaintiff was not disabled because he could perform other work in the national economy.  (R. 18).

The record establishes that Plaintiff, born on November 6, 1954, and 48 years old as of July 14, 2003, the date of the ALJ's decision, was is defined in the regulations as a younger individual.  20 C.F.R. §416.693.  Plaintiff has more than a high school, or high school equivalent, education and has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case.  (R. 17).  Based upon the Plaintiff's residual functional capacity, memory deficit and depressive disorder, the ALJ determined that Plaintiff is capable of performing a significant range of light work as defined in 20 C.F.R. §416.967.  This finding is not challenged, insofar as it is based only

on Plaintiff's physical residual functional capacity, memory deficit and depressive

disorder.  Rather, Plaintiff maintains that his bipolar disorder, in combination with his

physical limitations, rendered him completely disabled.   As stated, because Plaintiff

also claimed nonexertional limitations, a vocational expert was called to testify at

Plaintiff's hearing.  *Bapp*, 802 F.2d at 603.

The ALJ, however, failed to present to the vocation expert any hypothetical

situation involving an individual who, based on exertional limitations alone could,

according to the Grids, perform a full range of light work, but who also had a bipolar

disorder.  As such, the ALJ's finding is not supported by the record and, therefore, the

ALJ's finding of "not disabled" was not within the framework of Medical-Vocational Rule

202.20.  Upon remand for a new hearing, the ALJ should pose to the vocational expert

a hypothetical that include Plaintiff's bipolar disorder diagnosis, unless the ALJ is

otherwise able to discredit such diagnosis without violating the treating physician rule.


## II.      Credibility of Plaintiff's Subjective Complaints

Plaintiff argues the ALJ made only a conclusory finding that Plaintiff's subjective

complaints are not credible, and also made no credibility determination as to Plaintiff's

medical condition, despite the fact that Plaintiff's bipolar symptoms are supported by

medical evidence in the record.  Plaintiff's Memorandum at 15-16.  The ALJ record

establishes that that Plaintiff's allegations of limitations are not fully credible.  (R. 19).

Subjective symptomatology, by itself, cannot be the basis for finding a disability.

42 U.S.C. §423(d)(1)(A) (requiring a medically determinable impairment as the cause of

disability).  While subjective complaints alone are not sufficient to support a finding of

disability, such complaints must be accorded weight when they are accompanied by "evidence of an underlying medical condition" and an "objectively determined medical condition [which is] of a severity which can reasonably be expected to give rise to the alleged pain." *Cameron v. Bowen*, 683 F.Supp. 73, 77 n. 4 (S.D.N.Y. 1984).  There must be medical signs or other findings, which show there is a medical condition that reasonably could be expected to produce the conditions alleged and that, considered with all the evidence, demonstrates that plaintiff is disabled.  20 C.F.R. §416.929, SSR 96-7P.  As such, the ALJ is not required to "accept without question the credibility of such subjective evidence." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  Rather, "the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Id.* at 27.  Here, insofar as the ALJ found that Plaintiff's allegations were not fully credible to the extent alleged and inconsistent with other evidence of record, some of the ALJ's findings regarding Plaintiff's allegations are supported by the record.

In particular, the medical evidence and Plaintiff's subjective complaints regarding his physical limitations do not support Plaintiff's allegation of a complete inability to work.  (R. 16).  Plaintiff admitted that he took care of his personal needs, took care of his dog, watched television, prepared meals, performed chores, did laundry, mowed his lawn, walked, drove, used public transportation, rode a bicycle, and went out alone.  (R. 66-68, 228, 252).  Plaintiff also indicated that he shopped, managed his finances, read, spoke to friends on the phone, and visited friends.  (R. 69-70, 75, 103, 228, 252).  Plaintiff's complaints were also inconsistent with the objective medical findings of

record.  For example, treatment notes showing that Plaintiff's strength was 5/5 throughout, his straight leg raising test was negative bilaterally, he had full range of motion, he was neurologically intact, his gait was normal, he had no atrophy, and he had no paraspinal muscle spasms, (R. 78, 82, 99, 229), are in contrast to Plaintiff's assertions that Plaintiff is disabled due to back problems which result in an inability to sit, stand, or walk for extended periods of time, or lift heavy objects.  (R. 14, 16).  Further, with regard to Plaintiff's complaints of disabling memory loss, (R. 45), medical evidence, including treatment notes and medical evaluations, show Plaintiff's thoughts were logical, he was oriented, he had no memory loss disorder, his insight and judgment were fair, and he had no difficulty maintaining attention and concentration.  (R. 99, 104, 196).  Nevertheless, the ALJ's determination regarding Plaintiff's complaints of a psychiatric disorder did not take into account Dr. Parlato's bipolar disorder diagnosis and treatment notes.

It is the responsibility of the Commissioner and not the reviewing court to assess a claimant's credibility, and where substantial evidence supporting the ALJ's assessment of plaintiff's credibility, that assessment should be affirmed.  *Aponte v. Secretary of Health and Human Services*, 728 F.2d 588, 591 (2d Cir. 1984).  Here, the ALJ's failure to consider Plaintiff's subjective complaints in light of Dr. Parlato's treatment records and a psychiatric assessment of Plaintiff by Dr. Parlato, Plaintiff's treating psychiatrist, renders ALJ's credibility finding without the support of substantial evidence.

III.     **Request for Reassignment to Different ALJ**

As to Plaintiff's request that the matter, upon remand, be reassigned to a

different ALJ, Plaintiff's Memorandum at 17, such request is not properly before this

court.  In particular, a claimant who objects to the ALJ assigned to conduct a hearing is

required to notify the ALJ "at your [the claimant's] earliest opportunity."  20 C.F.R. §

404.940 (bracketed text added).  The ALJ shall then consider such objections and

decide whether to proceed with the hearing or withdraw.  *Id.*  If the ALJ does not

withdraw, the claimant may, after the hearing, present his objections to the Appeals

Counsel "as reasons why the hearing decision should be revised or a new hearing held

before another administrative law judge."  *Id.*  Federal courts have consistently

construed § 404.040 as providing a specific administrative process for resolving claims

of ALJ bias.  *See Grant v. Shalala*, 989 F.2d 1132, 1344-46 (3d Cir. 1993) (ruling district

courts lacked authority to make independent finding of fact regarding ALJ bias and that

district court may only review Commissioner's findings concerning ALJ bias under 42

U.S.C. § 405(g)); *Joe v. Apfel*, 1998 WL 683771, *5-6 (W.D.N.Y. July 10, 1998)

(declining to address issue of ALJ bias where claimant had not followed administrative

procedure outlined in 20 C.F.R. § 404.940); *Schmidt v. Callahan*, 995 F.Supp. 869, 887-

88 n. 16 (N.D.Ill. 1998) (finding plaintiff had waived claim that ALJ was judicially biased

by failing to present such claim to Appeals Council), *aff'd*, 201 F.3d 970 (7th Cir. 2000).

*Compare Miles v. Chater*, 84 F.3d 1307, 1400-01 (11th Cir. 1996) (observing that where

comments to which claimant objected were made by ALJ in the opinion issued after the

hearing, the claimant's earliest opportunity to object to such comments was before the

Appeals Council and, as claimant raised such issue to the Appeals Council, which failed

to address the issue, the district court had authority to address the issue and remand

the matter for further consideration before a different ALJ); *Ventura v. Shalala*, 55 F.3d

900, 902 (3d Cir. 1995) (reaching issue of ALJ's bias where claimant "abided by the

procedures set forth in the regulations regarding disqualification of ALJs [§ 404.940]

including that claimant's representative alleged during administrative hearing that ALJ

was prejudiced and requested recusal which ALJ refused without explanation, bias

issue was raised before Appeals Council which rejected such claim without explanation,

and district court similarly dismissed claim without explanation).

In the instant case, Plaintiff did not raise his claim that the ALJ was biased at the

"earliest opportunity."  In fact, even in the instant motion where Plaintiff first requests the

matter be reassigned to a different ALJ, Plaintiff provides no reason for such request.

Nor does the record support a finding that the ALJ is biased but, rather, only that the

ALJ overlooked Dr. Parlato's treatment records.  That no assessment was ever

requested from Dr. Parlato as to Plaintiff's mental capacity further supports this finding.

In any event, such oversight does not imply bias.  Accordingly, Plaintiff's request that

the case, upon remand, be reassigned to a different ALJ is DENIED.


## CONCLUSION

Based on the foregoing, Plaintiff's motion for judgment on the pleadings (Doc.

No. 9) should be GRANTED in part and DENIED in part; Defendant's cross-motion for

judgment on the pleadings (Doc. No. 12) should be DENIED.  The matter should be

REMANDED, pursuant to 42 U.S.C. § 405(g), sentence four, to the ALJ for further

proceedings, including a new hearing and development of the record, consistent with

this Report and Recommendation.  However, as the record does not establish any bias

on the part of the ALJ, Plaintiff's request for reassignment upon remand to a different

ALJ should be DENIED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        June <u>19</u>, 2008
              Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

<u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u>

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      June 19, 2008
               Buffalo, New York